INMATES OF the SUFFOLK COUNTY JAIL et al., Plaintiffs,

v.

Thomas S. EISENSTADT et al., Defendants.

Civ. A. No. 71–162–G.

United States District Court,
D. Massachusetts.

June 20, 1973.

Appendix A, June 2, 1973.

Appendix B, July 6, 1973.

Max D. Stern, Matthew Feinberg, Richard D. Clarey and John T. Williams, Boston, Mass., Stanley A. Bass, New York City, for plaintiffs.

Walter H. Mayo III, Asst. Atty. Gen., Kevin M. Keating, Crane, Inker & Oteri, Lawrence J. Ball, Asst. Corp. Counsel, City of Boston, Law Dept., Boston, Mass., for defendants.

## OPINION AND ORDER

GARRITY, Jr., District Judge.

This action arises under 42 U.S.C. § 1983 and jurisdiction is based on 28 U.S.C. § 1343(3), (4). Plaintiffs, named

inmates of the Suffolk County Jail in Boston, Massachusetts (otherwise known as, and hereinafter referred to as, the Charles Street Jail) sue on their own behalf and on behalf of all inmates at Charles Street Jail as a class. Defendants are the Sheriff of Suffolk County, who has primary custody and control over the facility; the master of the jail, who has ongoing responsibility for its daily operation; the Commissioner of Correction for the Commonwealth of Massachusetts; and the Mayor and nine City Councillors for the City of Boston.[1] Primarily at issue is whether incarceration of unsentenced inmates in this facility contravenes the Eighth and Fourteenth Amendments, although First and Sixth Amendment allegations are also involved.

The history of this litigation reflects a spirit of cooperation by the parties and their counsel with each other and with the court, resulting in submission of two stipulated partial judgments which were entered by the court on June 2 and July 6, 1972 and which improved conditions at the jail in many important respects and substantially narrowed the issues to be resolved. (Copies of these partial judgments appear as appendices A and B to this opinion.) Among other matters treated therein are the elimination from use of certain isolation facilities, promulgation of disciplinary rules and procedures, increase of the number of visits per week, and limitations upon the reading and censoring of mail by jail officials. In addition, the parties submitted a lengthy stipulation of undisputed facts, so that the greater part of the trial could be profitably devoted to expert testimony.

Trial on the merits covered parts of six days. Testimony was received from thirteen witnesses, including the defendants sheriff and master and the deputy master of Charles Street; Warren A. Worth, senior jail inspector for the Federal Bureau of Prisons; James V. Bennett, former Director of the Federal Bureau of Prisons; and various expert witnesses on such subjects as diet and nutrition, health care and facilities, and structural and architectural deficiencies. The record also includes voluminous documentary evidence, including official reports and written statements of experts on several aspects of the jail and approximately 30 affidavits of inmates (where inmates are quoted in footnotes to this opinion, it will be from their affidavits received in evidence and marked as exhibits). In addition, with the full cooperation of jail officials, the trial judge and his law clerk took a view of nearly every area of the facility and, without advance notice, stayed overnight in a cell. The findings of fact herein are based on the stipulation and documents, the testimony, and the court's personal observations.

The relief sought by plaintiffs, beyond that already afforded in the consent partial judgments, falls generally within two categories. One line of requested relief, premised upon the cruel and unusual punishment provision in the Eighth Amendment and the due process clause of the Fourteenth Amendment, focuses upon alleged constitutional defects in the quality and level of incarceration and is specifically based upon such things as structural inadequacies, poor plumbing, space limitations, inadequate diet and health care, inadequate exercise and recreation, and inadequate provision for personal hygiene, all of which, plaintiffs claim, have a pernicious, deleterious effect upon the physical and mental health of inmates. A second line of requested relief, premised generally upon plaintiffs' status as detainees rather than convicts and specifically upon First and Sixth Amendment considerations, seeks to provide plaintiffs with greater

1. Under Mass.G.L. c. 34, § 4, the Mayor and Councillors are county commissioners for Suffolk County and as such have executive as well as legislative powers. See, e. g., c. 34, § 14. Therefore the county's duty to provide "a suitable jail," c. 34, § 3, is partly the responsibility of the Mayor and City Councillors.

access to counsel, family and friends, and books, magazines and periodicals.

### Findings of Fact

1. Charles Street has been in continuous use since about 1848. It was originally constructed to house one prisoner per cell.[2] Cells for male inmates are in three wings, east, north and south. Centered in each wing, such that the exterior walls of the building are about 15 feet away from the cells, is a cell block which extends from floor to ceiling, i. e., there are no floors separating one tier or level of cells from another. Passage along each tier above ground level is by means of a catwalk, comparable to an outdoor fire escape, which leads to a central staircase at the end of the cell block. The catwalks on the side wings are connected to the catwalks on the long row. Each block consists of five tiers and has cells back-to-back on both sides, all facing an outer wall. The east wing (or long row) has 12 cells on both sides of each tier; there are four cells on both sides of each tier of the north and south wings. Of 180 cells for men, only 142 are considered operable; the rest, largely due to defects in the locks and plumbing, are not in use. A fourth, or west, wing houses administrative offices, medical facilities, and an auditorium used at various times as a chapel, theatre and recreation area. All four wings meet at an open, central rotunda.

2. The cells have four walls of stone; three of them are solid; the fourth wall, nearest the catwalk, has two openings, one a barred (and sometimes screened) window-like opening and the other a heavy, barred (and sometimes screened) door which swings on large hinges. The walls are cracked and flaked with repeated coats of paint; the floors are of composition tile; the walls and floor are damp and clammy. There are no heat outlets in the cells; heat is circulated by means of blowers at the end of the tiers; upper tier cells are extremely hot in the summertime and lower ones frigid in cold weather.[3] Cell size is approximately 8' wide x 11' long x 10' high, and was designed and constructed for single occupancy. Nearly all of the usable floor space in cells is taken up by two iron-slatted cots which have no springs, are covered by old, worn and often soiled mattresses which have no protective covers and are in deplorable and unhealthy condition. The area between the cots is not sufficient to allow two men to pass each other. It is impossible for two men to occupy one of these cells without regular, inadvertent physical contact, inevitably exacerbating tensions and creating interpersonal friction.[4] On either end of one of the cots there is open floor space approximately 1–1½ feet wide; however, there is no unused floor space at the head and foot of the second cot, one end being taken up by the toilet and the other by a metal, quarter-circular slab built into the wall, which is the only surface available for either storage or writing. The only other furnishings are a sink with cold running water, a few wall pegs for hanging clothes and an unshaded 60-watt light bulb which is built into the wall at the end of the cell nearest the catwalk and is controlled from outside the cell.

2. The National Council on Crime and Delinquency in its report "The Suffolk County, Massachusetts, Jail, a Survey" made to the Finance Commission of the City of Boston in 1968 (hereinafter referred to as the NCCD Report) at p. 4.04 stated, "[t]he housing of two men in a cell is a practice that is condemned by all authorities in the operation of adult detention facilities."

3. Inmate Chatman: "Since it is winter, I have to sleep with my clothes on at night, and still I'm always cold. It is so cold that the puddles which form on the floor after it rains start to form a thin sheet of ice on the top."

4. On July 12, 1972 an inmate was beaten to death by his cellmate, who had beaten a previous cellmate in May 1971. Despite the unusual nature of this occurrence, it is evidence of the potential for interpersonal friction inherent in a system of double occupancy cells; it also is evidence of the need for a system of classifying prisoners.

3. The plumbing system is antiquated, inadequate and impossible to repair economically and, as testified by James V. Bennett, "positively repulsive." Ruptures, leaks and flooding frequently occur in "the flats" (an area on the bottom level of the east wing where inmates eat their meals) and in the pump room (sub-basement) beneath the jail. There are major leaks in the boiler room ceiling. There are leaky ceiling pipes (both for water and heat) in the kitchen which sometimes drip directly onto food about to be served. Toilets and sinks in the cells are corroded, filth-encrusted and often a serious health hazard. Toilet bowls are not covered and many have no seats. The water in the toilets is at a level with the bottom of the bowl; the water does not partially fill the bowl as in modern public health code toilets. Flush valves in the toilet units are old and in need of repair or replacement, causing the toilets and sinks to get plugged up and to overflow frequently.[5] Usually when this happens, the cells must be closed but some cells remain in use despite leaking toilets and sinks. A fecal smell emanates from many toilets. This attracts bugs and other insects. There is no hot water in the cells; in the shower room, on some mornings there is no hot water at all, while on other days the water is scalding, because the cold water pressure is low.

4. The jail as a whole poses a serious fire hazard. In case of fire, removal of inmates can only be accomplished by unlocking each cell door individually. The only fire escape in the entire jail consists of a single steel ladder running from the fifth tier down to the first tier of the east wing. The ladder is enclosed in a steel mesh shaft and exits onto the corridor at the far end of the east wing. Since there is only one staircase per cell block, at the near end, i. e., closest to the rotunda, officers must unlock all doors on each tier, then retrace their steps in order to descend to the next lower tier. Most of the electrical current in the jail is direct current. It is necessary each year to repair, overhaul and convert several direct current motors at great expense. At present there is no emergency back-up electrical generator. In the Sheriff's 1971 Supplementary Budget Request No. 59 (p. 4, 3/4/71), it is stated that "in the event of an electrical power failure at the jail due to fire or other catastrophe, the consequences will most assuredly be disastrous because of the inexcusable lack of an emergency power generating system."[6]

5. Mosquitoes are a serious year-round problem. Roaches and waterbugs are prevalent. Rats are a serious, continuing problem. There is a recurrent problem of pigeons roosting inside the main jail, although programs of extermination and window repair periodically eliminate them.

6. There is a din which persists 24 hours a day which includes noise from radios, noise made by drug addicts and alcoholics during withdrawal[7] and steam pipes banging during cold weather. Since the cells are open, save for bars and sometimes screens, and there are so many stone and metal surfaces, noise made in any part of the main jail can be heard throughout the tiers. This makes sleeping extremely difficult.[8]

5. When we spent the night there, the wall valve serving as a faucet for the sink in our cell jammed while the water was running and we narrowly averted a flood by bailing the overflowing sink into the toilet with a small paper cup while our law clerk freed the valve, after several unsuccessful attempts, by hammering on it with the heel of his shoe.

6. Former inmate Sewell: "Electrical power often breaks down at the jail, particularly in the early morning. It is not unusual for four or five fuses to blow out in a single day."

7. Former inmate DiRocco: "All night the jail sounds like a nuthouse. All the junkies are screaming their guts out going through cold turkey."

8. On the night of the court's visit (the inmates were unaware of our return to spend the night), the noise seemed to increase after midnight and approached a virtual bedlam which lasted until dawn.

7. The women's section contains one cell block with four tiers on each side, ten cells to a tier.[9] The top two tiers and approximately half of the second tier are not used. The floor of the women's shower room is cracked, buckled and concave—apparently caving in. There are two bathtubs but one is not usable. There are six showers, three of which were not usable as of February 1, 1972. As of April 1, 1972, only one shower was operable. The shower room ceiling is cracked and the plaster corroding. The women's section cells are 6' x 11'. Each contains one spring bed on a frame, a toilet, a sink and a small table. The paint on the walls is peeling and the wall plaster is corroding. The women's sewing room has a major ceiling corrosion due to water seepage, which causes an unsafe working area. There is one fire extinguisher per tier in the women's section. There are no fire hoses.

8. During the past quarter century, seven separate governmental commissions studied Charles Street and condemned it. Most of them recommended that it be abandoned and a new facility constructed. The governmental agencies either sponsoring or conducting studies of Charles Street were the City of Boston (1949), a Governor's Committee (1962), the Municipal Research Bureau (1962), the Finance Commission (1963), the Redevelopment Authority (1946), the National Council on Crime and Delinquency (1968) and a Special Legislative Study Commission (1970). The latest of the studies recommended that a jail be included in a proposed new county courthouse complex, thereby decreasing the security problems inherent in transporting prisoners to the courts. Although the jail serves Suffolk County, which includes Chelsea, Revere and Winthrop, its costs are borne solely by the City of Boston. Unfortunately for the plaintiffs and their predecessor inmates, the more the jail was condemned, the more reluctant the City became to invest substantial funds in what appeared to be a doomed structure.

9. Since January 1, 1970, the average male population of Charles Street has been approximately 340,[10] comprising an average of about 290 detainees awaiting trial and about 50 sentenced prisoners, most of the latter committed to short terms for public drunkenness. Since January 1, 1970, the average female population has been 20–25. The average time spent by detainees awaiting trial in Suffolk Superior Court is from five to six months, except that detainees charged with capital offenses customarily wait from eight months to a year or longer. There is no classification program at the jail, i. e., no systematic effort is made to develop comprehensive information about an inmate and apply this information to cell assignments [11] (except that juveniles are kept together) and individualized program planning.

10. The majority of inmates, men and women, committed to the jail are in need of some kind of medical attention. An estimated 60% of the inmate population were drug users prior to admission. At the time of the trial, the medical staff at the jail consisted of two full-time nurses and a doctor who spent from one-half to three hours per day, Monday through Friday, at the jail. No trained staff were on duty between 6 P.

At least a dozen radios, turned to various rock music stations, seemed to be turned up to full volume; and for hours from a nearby cell, whether above or below we couldn't tell, a deep-voiced inmate, evidently deranged, shouted an obscene, incoherent monologue, beginning, "Ah want mah beer, you hear? Ah want mah beer . . .," over and over like a broken record.

9. Inmate Martin: "Sewage pipes run between the tiers on the women's side. They leak sewage, creating a terrible strench, which is worse when it rains outdoors."

10. The NCCD Report, see *supra* n. 2, concluded that an average daily population in 1966 of 208 inmates constituted severe overcrowding.

11. Former inmate Trainor: "Alcoholics were put in my cell several times. They always smell, and very often they throw up all over the cell."

M.–8 A.M. or on weekends. Funds have since been obtained for two additional nurses and one has been hired. A routine physical examination or health screening interrogation is not administered to inmates upon admission, nor are inmates designated to work in the kitchen given physical examinations. Special diets are not provided inmates with diabetes or other diseases which require special diets, although such inmates would be allowed to have special foods brought in to them. For heroin withdrawal, tranquilizers (librium), anticonvulsants (dilantin) and barbiturates (phenobarbital) are used.

11. Many inmates have mental problems which are aggravated by the cramped quarters and enforced idleness. Eugene J. Balcanoff, M. D., the Suffolk County Court psychiatrist, testified as to serious difficulties encountered by illiterates, inmates unable to tolerate inactivity and inmates suffering from impulse disorders in maintaining their mental stability while awaiting trial.[13] The doctor testified that, except in repeat offenders, the level of anxiety and apprehension in pretrial detainees is extremely high, higher than in prisoners after sentence; and that being locked up for 19 hours a day is damaging to their mental condition. Yet there is little psychiatric treatment available to the inmates. For the most part it must come from the nurses who, though highly competent generally, do not have the training to handle mental problems.

12. Food is served in half-hour shifts. It is prepared and served only by sentenced inmates, mostly alcoholics, because only sentenced inmates have work details. Detainees do not have work details. No medical personnel or anyone else trained in health inspects the kitchen facilities and food storage area. There is no dining hall or cafeteria; presumably when the jail was built it was planned that a prisoner be fed in his cell. Inmates eat in the ground level corridors on picnic tables which are lined end to end on either side of the long row and immediately adjacent to the cells along that tier.[14] Inmates occupying these cells may be locked in while other inmates are eating. The food is prepared in a basement kitchen and carried in cauldrons and pans up one flight of stairs to "the flats" area of the first floor where it is dispensed from containers within a steam table which is inoperable. This results in a substantial number of inmates receiving food that is cold. In addition, since the food lies open on trays in a serving area which is located below stairways and catwalks, which the prisoners use en route to meals, dirt from their shoes and from these stairways is kicked loose and floats down onto the food. The nutritional value of the meals served is generally adequate, although deficient in total calories and vitamin A.

13. Clothing is issued to sentenced inmates only. Occasionally, detained inmates may obtain needed clothing if they request it. Inmates are permitted by the rules to send their shirts out to be cleaned once per week; but in practice this service is available must less frequently and shirts sent to the laundry are often lost. There is no other laundry service. However, soap is issued and inmates interested in clean clothing may compete for the use of the one sink located on each tier.[15] There is no sys-

13. Inmate Marson: "The reality of being confined in a tiny cell with another person for 21 hours each day can be maddening. The idleness and lack of privacy affects all of us mentally, and often leads to depression. Within a space of only five weeks, three separate cellmates of mine have attempted to commit suicide."

14. Inmate Johnson: "The benches on which we have to sit are often wet and dirty. Garbage is on the floor next to the dining area, and the silverware is usually dirty." Former inmate Trainor: "Once I found a cigarette butt inside a meatball I was eating." Inmate Martin: "On March 19, I found a worm in my mashed potatoes."

15. Former inmate Trainor: "There are only four hot-water sinks in the jail, one on each tier, and only two of them worked.

tematic program for keeping cells clean and sanitary, either during occupancy or between occupancies, although the means for doing so are available to inmates. Occupied cells are nearly all dirty.

14. Inmates are released from their cells for only four and one-half hours on the average day, one and one-half hours of which are for meals. In the remaining three hours of free time, an inmate may stand in line in order to shower and shave, wash out his clothing, purchase articles from the commissary [16] or go on sick call. Waiting lines generally form for each of these activities, making it improbable that an inmate could do more than one of these things during any given free-time period. At irregular intervals ranging from every sixth day to about once every three weeks, an inmate is also released for a one and one-half hour recreation period in the evening. On Sundays, inmates are permitted to attend Chapel in the morning and may choose between free time and a movie in the afternoon. Recreation facilities are essentially two: the small yard of the jail, where volleyball, basketball and other forms of physical exercise are available on a very limited basis during the warmer months (approximately April 15 to November 15), and the chapel, which contains a bumper-pool table, two billiard tables, a television, a ping-pong table, a pinball machine, and a badminton net. There is no organized program of physical exercise.

15. During the daytime shift (8 A. M.–4 P.M.) there are nine officers on duty who are given cell block assignments. Of these, two men are assigned to cover each of the first four tiers and one man is assigned to cover the fifth tier. In other words, with the exception of the officer assigned to the fifth tier, each officer has responsibility for one whole tier of the north or south wing plus one side of an east wing tier. During each of the two nighttime shifts, there are four or five officers on duty, one being assigned to cover each tier. Since the average male inmate population is approximately 340, staff limitations are partly responsible for the limited time allowed inmates out of their cells.

16. Since entry of the second partial judgment in these proceedings on July 6, 1972, inmates are permitted three visits a week, each to last one hour when possible. Visits are limited to adult members of an inmate's immediate family; friends and children may only visit if special permission is obtained. Each visit may be with as many as two people. Visiting hours are Monday through Saturday, 9:15 A.M. to 10:50 A.M. and 1:00–3:30 P.M.

17. Attorneys may visit client inmates as frequently as necessary, but such visits may only occur between 9:00–11:00 A.M. and 12:00 noon–4:00 P.M., Monday through Saturday. Attorneys may visit after 5:00 P.M. only if special permission is obtained. Attorneys may not visit on Sundays or holidays. Attorneys may send law students to interview in their stead. Joint conferences of inmates and attorneys with outside witnesses or codefendants would be permitted by jail officials, provided arrangements are made in advance.

18. In contrast to the conditions of confinement at Charles Street Jail, convicted offenders housed at state correctional facilities may visit with attorneys at any reasonable hour including evening hours without special permission. Attorneys may visit on any day, including Sundays and holidays. Inmates at state institutions may receive three visits a week, from friends and children as

---

In order to wash my clothes, I had to first go to the shower room to get soap, then wait my turn at the sink, and finally wash out my clothes. By this time, free time would be over. Then I had to somehow hang up my wet clothes to dry in my cell."

16. Inmate White (16 years of age waiting for trial over 8 months): "On several occasions the line for the canteen has been so long that I have had to wait until the next day to buy what I wanted."

well as from adult family members. Each visit is for the duration of visiting hours, which range from two to three hours.

19. All state prisoners occupy single rooms or cells. They generally are locked in or required to be in their cells between 10:00 P.M.–6:00 A.M. but, except for headcounts, are not required to be in cells during the rest of the day and evening. State prisoners may have televisions and radios in their cells and are permitted to watch television every day or night.

20. Inmates in all state institutions are given clean clothes as needed. Free laundry service for all clothing is available at least once weekly. Inmates may ordinarily pay to have more frequent laundry service. Every state inmate is given a complete physical examination upon admission to a state institution.

### Conclusions of Law

During the past few years, due largely to the courage of young poverty-program lawyers, the soul-chilling inhumanity of conditions in American prisons has been thrust upon the judicial conscience. The traditional "hands-off" doctrine, holding that federal courts are powerless to interfere with the operation of state and county correctional institutions, see Eaton v. Bibb, 7 Cir., 1955, 217 F.2d 446, 448, cert. den. 1955, 350 U.S. 915, 76 S.Ct. 199, 100 L.Ed. 802, has slowly yielded to the broader principle stated by Judge Murrah in Stapleton v. Mitchell, D.Kan.1945, 60 F.Supp. 51, 55, "We yet like to believe that wherever the Federal courts sit, human rights under the Federal Constitution are always a proper subject for adjudication, . . . ." Twice last year the Supreme Court reversed lower federal court decisions dismissing state prisoner complaints because they were thought by the lower courts to be in the area that should be left "to the sound discretion of prison administration" and ordered that the complaints be heard on the merits. Haines v. Kerner, 1972, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 and Cruz v. Beto, 1972, 405 U.S. 319 at 321, 92 S.Ct. 1079, at 1081, 31 L.Ed.2d 263, commenting *per curiam* in the latter case, "Federal courts sit not to supervise prisons but to enforce the constitutional rights of all 'persons' which include prisoners." [17]

It is almost impossible to say anything about the national shame of America's prisons that has not been said before; and we shall not try. The final report of the 42nd American Assembly, a national, non-partisan [18] educational institution, following its December 17–20, 1972 meeting on "Prisoners in America", stated among other things:

Most correctional institutions are and can be no more than mere warehouses that degrade and brutalize their human baggage. . . . Local jails are even worse than prisons. These cages of steel and concrete are a national disgrace. In them standards of humanity and decency are violated, and the presumption of innocence which is so basic to American justice is ignored.

Many interested persons are unaware that prisons are relatively new in the history of penology [19] and were established as a hopefully humane alternative

17. This is not to say, of course, that state courts lack jurisdiction to grant relief. Com. ex rel. Bryant v. Hendrick, 1971, 444 Pa. 83, 280 A.2d 110, 113–114. But they have done so infrequently.

18. Participants at the December 1972 meeting included elected public officials from federal, state and local governments, clergymen, corrections commissioners, newspaper editors, law school deans and professors, and representatives of business and labor; including former Commissioner Jerome G. Miller of the Massachusetts Department of Youth Services and Sheriff John J. Buckley of Middlesex County.

19. "The history of penology is the saddest chapter in the history of civilization. It portrays man at his worst. His cruelty, brutality and inhumanity are unrestrained through most times in most places. Virtually absolute power over nearly helpless people has often wholly corrupted." R. Clark, *Crime in America*, 212 (1970).

to punishments such as banishment, flogging and mutilation. D. Rothman, *The Discovery of the Asylum* (1971). Having read a fair number of court opinions and scholarly articles on the subject of current prison conditions and their baleful consequences both to individual inmates and to the community, we think that a serious argument could be advanced for a return to the old system.[20] Charles Street Jail is by no means the worst of American prisons and jails. See, e. g., Holt v. Sarver, E. D.Ark., 1970, 309 F.Supp. 362, describing the Arkansas State Penitentiary system, and Collins v. Schoonfield, D.Md. 1972, 344 F.Supp. 257, dealing with the Baltimore City Jail. Nevertheless, in spite of radical improvements in the operation of the jail made by agreement of the parties on the threshold of the trial,[21] the Charles Street Jail remains so bad that the 42nd American Assembly might well have been writing about it when stating, "Local jails are even worse than prisons."

Another factor bearing upon our decision is the backlog of criminal cases pending in the Massachusetts Superior Court for Suffolk County, causing delays of several weeks to several months before a defendant unable to make bail receives a trial. The situation reflects a puzzling refusal by a majority of Massachusetts legislators to increase the size of the state trial court. During the past five years, chief justices of the Superior Court and bar association officers have made annual pilgrimages to legislative committees, seeking increases in the number of Superior Court judges and staff, justifiable by every national standard of judicial administration. The total annual cost to the Commonwealth of the increases sought would be less than the cost of constructing a single mile of superhighway. Yet since 1967 the legislators have turned a deaf ear.

■ The relevancy to these proceedings of the logjam of criminal cases in the Superior Court for Suffolk County lies in the fact that approximately 85% of the population of the Charles Street Jail have not been convicted of the crime for which arrested. They are waiting to be tried. Although Charles Street houses a small percentage of sentenced misdemeanants—most for drunkenness—for all practical purposes the facility is a detention center. Cases dealing with facilities which are principally employed as pretrial detention centers have held uniformly that "their role is but a temporary holding operation, and their necessary freedom of action is concomitantly diminished. . . . The purpose of incarceration . . . was simply detention in order to assure presence at trial. Punitive measures in such a context are out of harmony with the presumption of innocence." Anderson v. Nosser, 5 Cir., 1971, 438 F.2d 183, 190; see Brenneman v. Madigan, N.D.Cal., 1972, 343 F.Supp. 128, 135–136; Collins v. Schoonfield, supra, 344 F.Supp. at 265–266; Hamilton v. Love, E.D.Ark., 1971, 328 F.Supp. 1182 at 1191; Jones v. Wittenberg, N.D.Ohio, 1971, 323 F.Supp. 93, 100. Punitive measures are also out of harmony with the Fourteenth Amendment to the Constitution, which forbids the deprivation of liberty without due process of law. Although restraints on liberty are required to assure the presence at trial of persons unable to make bail or charged with capital offenses, such re-

---

20. If prisons generally are so evil, one might reasonably ask, "Except where mandatory, why do judges participate in the devastating process by imposing jail sentences?" Obviously a judge may answer this question only for himself, and the following over-simplified attempt is personal and the use of "we" strictly editorial: we have considered incarceration necessary for the protection of society and been influenced, perhaps subconsciously, by the pagan maxim, "Necessity knows no law except to conquer."

21. These improvements were incorporated in two partial judgments in these proceedings dated June 2 and July 6, 1972 and entered with finality pursuant to Rule 55(b) Fed.R.Civ.P., on July 7; and appear as appendices to this opinion.

straints must be circumscribed to include only those which are absolutely necessary. As in any case where precious personal liberties are affected, the state bears the burden of justification.

■ "Punishment" cannot be justified without a judicially-determined finding of guilt; in other words, pretrial detainees may not be "punished" for crimes charged against them but not yet proved against them. If a pretrial detainee is incarcerated in worse circumstances than the convict who is being "punished", it is difficult to say that the detainee is not also being punished. "It is clear that the conditions for pretrial detention must not only be equal to, but superior to, those permitted for prisoners serving sentences for the crimes they have committed against society." Hamilton v. Love, *supra*, 328 F.Supp. at 1191. See also Jones v. Wittenberg, *supra*, 323 F.Supp. at 100. Thus the first test of the constitutional sufficiency of incarceration at the Charles Street Jail rests on a comparison between the quality of that incarceration and the quality of the type of incarceration which the state designates "punishment" in a correctional facility for convicts.

A second test employs traditional analysis long applied in due process and equal protection cases. The court must first identify the interest which the state seeks to advance by incarceration. It must then consider the means applied to secure this interest and determine whether they are rational and necessary. If a detainee is subjected "to gratuitous and wholesale deprivations of rights which are unrelated to insuring his presence at trial" Brenneman v. Madigan, *supra*, 343 F.Supp. at 137, the due process clause is violated. In other words, limitations on the liberty of a detainee must be measured against the state's sole interest in presenting him for trial. And "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can

be more narrowly achieved. The breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose." Shelton v. Tucker, 1960, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231, quoted in Brenneman v. Madigan, *supra*, 343 F.Supp. at 138.

■ As a facility for the pretrial detention of presumptively innocent citizens, Charles Street Jail unnecessarily and unreasonably infringes upon their most basic liberties, among them the rights to reasonable freedom of motion, personal cleanliness, and personal privacy. The court finds and rules that the quality of incarceration at Charles Street is "punishment" of such a nature and degree that it cannot be justified by the state's interest in holding defendants for trial; and therefore it violates the due process clause of the Fourteenth Amendment.

Before elaborating on this finding, certain observations are warranted. First, we find little to criticize in the efforts of the named defendant-officials to enhance and make tolerable the quality of Charles Street Jail. All parties concede that substantial improvements have been made in recent years. In many areas, notably in the medical staff, prisoners are attended by dedicated, competent personnel. This is not a case where a court might say, with some innuendo, that defendants' efforts were "too little, too late"; considering the obstacles, their efforts have been commendable. But these obstacles, beginning with the antique and obsolete structure itself and including budgetary limitations upon such things as staff size and program planning, render real improvement impossible.

■ To follow the problem to its source inevitably illuminates a second consideration which the defendants, especially the mayor and city councillors, have firmly pressed upon us through counsel. Both the testimony and our own personal observations lead us to conclude that constitutional require-

ments cannot be satisfied without construction of a new jail and, more immediately, the addition of staff. Without question, this will impose an economic burden upon the taxpayers of Suffolk County, which may, however, be lessened by selling the valuable three acres of land on which the jail stands.[22] But it is fundamental that a deprivation of constitutional rights may not be justified upon economic considerations. See Rozecki v. Gaughan, 1 Cir., 1972, 459 F. 2d 6, 8; Jackson v. Bishop, 8 Cir., 1968, 404 F.2d 571, 580; Brenneman v. Madigan, *supra*, 343 F.Supp. at 139. Moreover, there is no need in this case to rely solely on legal principles to support a judgment · which will have widespread cost ramifications. For years, the consensus in this community, from commissions and experts making in-depth studies of the facility to passing citizens struck by its archaic and forbidding exterior, has been to condemn the use of the jail. In 1968, in a report entitled "The Suffolk County, Massachusetts, Jail: A Survey," the National Council on Crime and Delinquency wrote:

> "The physical plant of the Suffolk County Jail is antiquated, insufficiently secure for high risk prisoners and does not provide decent housing arrangements for any of its prisoners. The facility is a relic of the past. It cannot be remodelled to provide a modern adult detention program. Even if certain aspects of the jail (the kitchen facilities, the plumbing system, the power plant) could be totally renovated and made more adequate, these improvements would still not touch at the core problem of the physical plant. . . . The Suffolk County Jail, should be replaced . . .."

No one in the entire course of this proceeding has stated a contrary view. In our opinion, no one could. The failure to date to replace the jail is reflective of political inertia. It does not reflect a debate in the community over the need for a replacement facility.

The factual basis for this opinion readily appears in our findings of fact. Briefly, an inmate at Charles Street who merely stands accused spends from two to six months or longer awaiting trial. Each day he spends between 19 and 20 hours in a cell with another, strange, and perhaps vicious man. When both inmates are in the cell, there is no room effectively to do anything else but sit or lie on one's cot. The presence of a cellmate eliminates any hope of privacy; an inmate may not use the toilet except in the presence of a stranger mere feet away. He passes his confined hours in a dank, decrepit room, often smelling of human excrement, usually in clothes which he cannot keep clean, and able to see nothing outside the cell except parts of the catwalk and outside wall. His mental stability may be affected. His food is often cold and dirty and must be eaten in a corridor that cannot be kept clean. In the three or four hours a day outside his cell, he has few opportunities for meaningful physical exercise, effectively none in the colder months. Recreation of any kind is severely limited.

A comparison drawn between this confinement and that of sentenced inmates in Massachusetts state facilities reveals that it is punitive in fact, if not in theory, and also that this type of confinement is unnecessary to the basic interest of the state in pretrial incarceration. No less than pretrial facilities, correctional facilities have a strong interest in security; but the correctional authorities of Massachusetts do not find single cell occupancy and long hours of free time out of cells inconsistent with security requirements. If anything, single cell occupancy, by reducing the number of inmates to be controlled, would enhance security at Charles Street. Although we recognize that more free time

---

22. In 1964, the Boston Redevelopment Authority estimated the value of the site to be at least $2,000,000. Since then the surrounding area has been much improved and developed and real estate values have risen sharply.

places heavier burdens on staff, and may require hiring of additional staff, it is in no way inherently inconsistent with security, given adequate staff and planning. More important, it is consistent with the due process requirement that a presumptively innocent man's right to personal mobility be curtailed only to the extent warranted by the state's interest in confining him.

In our view, shared by other courts dealing with conditions of pretrial detention, this type of case is more appropriately analyzed under the due process clause of the Fourteenth Amendment than under the cruel and unusual punishment provisions of the Eighth Amendment. See, e. g., Brenneman v. Madigan, *supra*; Jones v. Wittenberg, *supra*. Nevertheless, certain of the considerations that adhere to the Constitution's prohibition of cruel and unusual punishment apply here and merit brief discussion. First, what amounts to "cruel and unusual" at a given point in time reflects "the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 1958, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L. Ed.2d 630. A facility such as this, "constructed in an era when the only purpose of the jail was to keep people locked up," Jail Survey at 4.15, may, with the passage of time, cease to meet the community's standards of humane treatment, particularly as people learn more about the goals and problems of penology. Assuming that the sense of the community is reflected in the quality level of conditions of confinement of convicts, as to which some harshness may be justified on theories of deterrence and retribution, it is reasonable to believe that that sense would be offended by a facility housing presumptively innocent persons, as to whom theories of deterrence and retribution are inapplicable,[23] the quality level of which is grossly inferior to that afforded convicts.

■ Convicts in Massachusetts penal and correctional institutions are cared for and treated much better than inmates at the Charles Street Jail. With respect to cell space, sanitation, food, medical care, educational programs and recreation, there is really no comparison. Parenthetically, even at Charles Street, the convicted misdemeanants are treated better than the detainees. The former are issued clothing; the latter are not. The former are given work assignments; the latter are not.[24] Thus constitutional assessment of the jail under the Eighth Amendment confirms our conclusion under the Fourteenth. True, such an analysis can be carried too far. It does not mean that new correctional and penal institutions may not be constructed or old ones renovated because they might thereby become less confining and punitive than certain decrepit detention centers within the same system. It does mean, however, that prisoners awaiting trial, to whom the science of penology and programs of rehabilitation are not technically applicable, may not constitutionally be made the orphans of criminal jurisprudence whose degradation may be ignored because they are merely charged with criminal offenses rather than found guilty of them.

The irony of the situation of pretrial detainees is apparent. Their condition should be of relatively slight concern to the law because so temporary. Under the Sixth Amendment they "enjoy the right to a speedy trial" and presumably in the near future they will move along, either to prison after conviction or to freedom after acquittal. Too often, of course, this happens in the far future.

23. This is, of course, not to say that restraints on a detainee's liberty may not be imposed, nor that punitive steps may not be taken, if the detainee poses a threat to the security or order of the institution.

24. Senior Inspector Worth of the Federal Bureau of Prisons testified that the defendant jail officials are mistaken in their impression that unsentenced prisoners may not be compelled to work or to keep their cells clean. No one challenged this testimony.

Meanwhile a plausible theoretical basis for postponing concern for their civil rights remains. In the instant proceedings, the irony has been compounded by the extent of the deterioration of Charles Street: a series of experts' reports commencing in 1949 concluded that it was too antiquated to be renovated; accordingly the City felt that any capital improvements would be wasted and, from at least 1949 to 1969, only emergency repairs were authorized.

Regarding the central effect of our order, namely, the elimination and replacement of the present facility, it has been the considered judgment of everyone who has critically evaluated the jail, including some of the defendants in this case, that it has long since outlasted its serviceability. Granted, a layman initially might view this abstractly as a concurrence among "experts" based upon academic predispositions concerning penology. However, to draw upon the language of Mr. Justice Marshall concurring in Furman v. State of Georgia, 1972, 408 U.S. 238, 362, 92 S.Ct. 2726, 33 L.Ed.2d 346, "whether a substantial proportion of American citizens would today, if polled, opine that [this facility] is barbarously cruel" is of less importance than "whether they would find it to be so in the light of all information presently available. . . . With respect to this judgment, a violation of the Eighth Amendment is totally dependent on the predictable subjective, emotional reactions of informed citizens." In concluding that Charles Street must be replaced, the court has judged it against a standard of basic humanity toward men innocent in the eyes of the law, not against abstract standards of sociological, psychological and penological preference; and we believe on the basis of the testimony and other evidence in these proceedings that most citizens, if they knew the facts firsthand, would reach the same result.

As for other types of relief requested in plaintiff's proposed order, in principle nearly all of it should be granted. Realistically, however, much of it is rendered impractical by the physical limitations of the facility itself. For example, the food preparation and serving facilities are not sufficiently flexible to provide for special diets; nor are there facilities for adequate exercise. These and other factors must be considered in the planning and staffing of a replacement facility, and such a facility must be adequate to afford inmates free time and recreational alternatives comparable to those enjoyed by sentenced inmates. Until such a facility has been acquired or constructed, however, the court will not impose requirements upon a jail that is inadequate to provide them.

At the same time, certain improvements are feasible within the limitations of the Charles Street Jail and will be ordered. In view of additions already authorized, and in part already made, to the medical staff, it is reasonable and essential that any inmate remaining at the jail over seven days be given a complete physical examination, as is the practice in state correctional facilities. Complete physical examinations must also be given all kitchen workers and food handlers. In the interests of personal hygiene, institutional clothing must be issued to all inmates who need it and full free laundry service must be provided for all inmates at least once a week. It will also be ordered that mail from a Massachusetts attorney may be opened for inspection only in the presence of the inmate to whom addressed, thereby bringing defendants' practice into compliance with Smith v. Robbins, 1 Cir., 1972, 454 F.2d 696, 697.

Certain other relief not inconsistent with the physical facility but arguably beyond present staff limitations must be provided now, even if this requires the hiring of some additional personnel. See Wyatt v. Stickney, 1972, M.D.Ala., 344 F.Supp. 387. Visits with counsel, for example, are presently limited to hours when counsel are least available to utilize them. In view of the requirements of the Sixth Amendment and the fact that in state facilities, where the need for counsel is far less than pretrial,

counsel may visit at any reasonable hour including evenings without obtaining special permission, visiting hours for counsel at Charles Street must be expanded (no change will be ordered in visiting hours for law students assisting counsel, as to whom present regulations are reasonable). Similarly, there is no rational reason other than staff limitations why detainees should not have at least one additional hour away from their cells during daylight hours, although lighting defects make this impractical at night from a security standpoint; nor for the elimination of afternoon free time on Tuesdays and Saturdays.

It is also consistent with the physical limitations of the jail that, after a reasonable time within which to make necessary arrangements and changes, it be converted to single cell occupancy for detainees during the period while a new facility is being constructed or acquired. This conversion may be accomplished in part by increasing the number of usable cells. There are approximately 38 cells not currently in use because of defective locks or plumbing; some of them may be made habitable. In all likelihood, it will require a reduction in the number of detainee prisoners. Plaintiffs have argued that defendants have a number of means at their disposal, short of refusing further commitments,[25] whereby the population of Charles Street may be reduced. Without vouching for the practicability of the means suggested, several of them merit serious consideration by the defendants. Sentenced inmates, typically serving short sentences for drunkenness and who may continue to be confined two per cell, may be transferred to the Suffolk County House of Correction at Deer Island or to other state or county institutions. Some pretrial detainees may be lodged in adjacent counties or with state authorities. Juveniles may be transferred to the Division of Youth Services. Women inmates may be transferred to M.C.I. Framingham, thereby permitting most of the women's section, now under-utilized, to be closed to women and converted to use by male inmates and personnel.[26]

Finally, no later than November 30, 1973, when detainees will be occupying cells singly and overcrowding of the common areas will have been lessened, two additional orders shall become effective. See Brenneman v. Madigan, *supra,* 343 F.Supp. at 141, and Collins v. Schoonfield, *supra,* 344 F.Supp. at 279. First, age and family relationship restrictions on visitors to detainees will be removed, except that visits by particular persons may be denied for reasons of security. Secondly, defendants shall arrange for the installation of a sufficient number of pay telephones, which shall not be wiretapped or monitored in any way, to permit detainees to make at least one telephone call daily.

In other respects, except where afforded by the two partial judgments already entered, the relief sought by plaintiffs is denied.

## FINAL JUDGMENT

Upon the general finding that the Charles Street Jail stands in violation of plaintiffs' rights under the Constitution of the United States and the specific findings of fact and conclusions of law

---

25. "If the state cannot obtain the resources to detain persons awaiting trial in accordance with minimum constitutional standards, then the state simply will not be permitted to detain such persons." Hamilton v. Love, *supra,* 328 F.Supp. at 1194.

26. A small part of the women's section would continue to be used for women prisoners, but only as a commitment receiving station from which women sentenced to definite terms of less than two years would routinely be transferred to M.C.I. Framingham. The women's section could not be closed entirely without in effect precluding Suffolk County judges from imposing jail sentences of less than two years on women offenders. See Mass.G.L. c. 279, § 18.

stated in the court's opinion, it is hereby ordered, adjudged and decreed that:

Defendants Sheriff Thomas S. Eisenstadt, Master Harold V. Langlois, Commissioner John O. Boone, Mayor Kevin White and the Councillors of the City of Boston who are also County Commissioners for Suffolk County, their agents, servants, employees, and attorneys, and all persons in active concert or participation with them, are permanently enjoined (a) from housing at the Charles Street Jail after November 30, 1973 in a cell with another inmate, any inmate who is awaiting trial and (b) from housing at the Charles Street Jail after June 30, 1976 any inmate who is awaiting trial.

It is furthered ordered that as soon as practicable, no later than 30 days from the date of this order, defendants Eisenstadt and Langlois shall:

(1) provide complete physical examinations to all inmates who are to be confined in the Charles Street Jail for over seven days and to all kitchen workers and food handlers before assignment or reassignment to the kitchen or food serving areas.

(2) provide institutional clothing to all inmates who need it and free laundry service to all inmates at least once a week.

(3) provide that on every day of the week every inmate awaiting trial (unless confined to a cell for disciplinary reasons) have four hours of free time away from his cell, not including time spent at meals.

(4) not open mail from an attorney who is a member of the bar of Massachusetts except in the presence of the inmate to whom addressed.

(5) expand the regular hours for attorney-client visits to 8:00 P.M. on weekdays and from 9:00 A.M.–5:00 P.M. on Sundays and holidays.

It is further ordered that as soon as practicable, no later than November 30, 1973, defendants shall

(6) allow children and friends as well as adult relatives to visit inmates await-ing trial without special permission, except that visits by particular persons may be denied for reasons of security.

(7) provide for daily access to pay telephones, which shall not be monitored in any way, by inmates awaiting trial.

It is further ordered that defendants shall

(8) post inside the jail, in at least two places in the men's section and one in the women's section where they can be viewed by inmates, copies of this final judgment and the partial judgments dated June 2, 1972 and July 6, 1972 and keep them posted for at least ten days, and

(9) file with the Clerk, and serve copies on plaintiffs' counsel, progress reports as to (a) compliance with specific provisions of this final judgment and of the partial judgments and (b) steps taken to comply with provisions of this judgment to become effective in the future, the first such report to be filed on or before August 1, 1973.

The court shall retain jurisdiction in the case and enter further orders as may be required.

### APPENDIX A

### PARTIAL JUDGMENT

Complaint was filed in the above-entitled proceeding as a class action seeking declaratory and injunctive relief as to allegedly unconstitutional conditions and practices at the Suffolk County Jail, including the treatment of prisoners held in solitary confinement. After pre-trial conference, the parties have agreed to an order respecting certain aspects of the use of solitary confinement, having reserved other issues relating to discipline and solitary confinement for trial. Accordingly, without deciding whether the treatment and conditions which have existed in the past with respect to this matter have been unconstitutional, and the court having determined that there is no just reason for delay on this portion of the case, it is hereby ordered, adjudged, declared, and decreed that

Defendant Eisenstadt and defendant Langlois, and their officers, employees,

agents, successors and all persons acting in concert with them:

1. Shall not confine any inmate of the Suffolk County Jail in any of the solitary confinement cells (otherwise known as the "heavy solitary" or "isolation" cells) found in that portion of the jail known as the Gatehouse or in any of the padded cells now located in the Gatehouse. Within a reasonable time after this order, the padded cells shall be dismantled and the solitary confinement cells so disabled as to make impossible confinement therein.

2. Shall not confine any inmate to any of the "light solitary" cells (otherwise known as "segregation" or "semi-solitary" cells) found in the Gatehouse unless:

a. It is determined by the Disciplinary Committee that the inmate's conduct presents such a serious threat to the health and safety of other inmates and/or officers that it is necessary to remove him from the main jail. In any case in which jail officials desire to place an inmate in a "light solitary" cell during the evening shifts (4:00 p. m.–8:00 a. m.) the Disciplinary Committee shall be convened by 9:00 o'clock on the following morning. And

b. A jail officer is present at the Gatehouse at all times in which any inmate is confined therein.

3. Shall provide to all inmates confined to "light solitary" confinement cells in the Gatehouse or maximum security cells in other portions of the jail, or confined to their own cells for disciplinary purposes:

a. The same diet as furnished to inmates in general population;

b. A daily physical examination by the jail physician, including examination of temperature, heart and blood pressure as provided in the Massachusetts Rules and Regulations for Jails and Houses of Corrections, Rule 16;

c. A bed, mattress, blanket, adequate lighting, clothing, sink, toilet, toilet paper, soap, linen, and towel;

provided however that if an inmate attempts to destroy the bed or uses the bed, linen or towel as a weapon, these items may be removed from the cell.

d. Writing materials, if desired.

e. Daily exercise outside of the cell.

f. A daily shower.

## APPENDIX B

### SECOND PARTIAL JUDGMENT

Complaint was filed in the above-entitled proceeding as a class action seeking declaratory and injunctive relief as to allegedly unconstitutional conditions and practices at the Suffolk County Jail. After pre-trial conference the parties agreed to enter into a consent order regarding certain aspects of solitary confinement, which order was entered on June 2, 1972 entitled "PARTIAL JUDGMENT." After evidentiary hearing in this case, but before any issues have been submitted to the court for decision, the parties have agreed to a further order respecting additional aspects of the case, leaving other issues to be decided by the court. Accordingly, without deciding whether the prior practices of the defendants have violated the constitution, or whether the matters set forth below are either constitutionally required or constitutionally sufficient in all respects, and the court having determined that there is no just reason for delay on this portion of the case, it is hereby Ordered, Adjudged, Declared, and Decreed that

Defendant Eisenstadt and defendant Langlois, and their officers, employees, agents, successors and all persons acting in concert with them:

1. Shall draft a revised and up-to-date Inmate Guide which shall include a) a comprehensive list of rights and privileges of inmates, described with enough specificity to prevent inconsistent application, arbitrariness, and favoritism in their implementation and, b) an explanation of all programs, work opportunities and services available to in-

mates. The Inmate Guide shall be promulgated by publication in English and Spanish, public posting within the jail, and distribution to each present inmate and all new inmates upon admittance. A copy of the Guide shall be available to any attorney, friend or family member of a jail inmate. The Guide shall be revised and republished on a regular basis.

2. Shall draft and promulgate a set of disciplinary rules and regulations, providing for offenses, penalties and disciplinary procedures. An inmate subject to disciplinary action shall be furnished with advance written notice of the charge; the right to call, confront and cross-examine witnesses; and written notice of decision.

3. Any inmate questioned by jail officials regarding the commission of any offense punishable by the criminal law shall first be informed that he has a right to remain silent, that anything he says may be used against him in a criminal proceeding, that he has a right to counsel and that if he does not have counsel, counsel will be appointed if he cannot afford it.

4. Shall permit (in addition to those matters covered in the first "PARTIAL JUDGMENT", ¶3) inmates confined to solitary confinement cells of any kind, confined to maximum security cells, or confined to their own cells for disciplinary reasons, to possess reading materials and to have correspondence to the same extent as members of the general population and to have visits with attorneys.

5. Shall not read or censor any inmate mail. Outgoing mail may be sealed when deposited for mailing and shall not be opened by jail officials. The number of letters shall not be limited.

6. Shall permit inmates to have three visits per week, each to last for one hour when possible.

7. Shall permit inmates to receive packages through the mail containing items which would be delivered if personally brought by visitors. These pack-ages may be opened and searched for contraband. The list of permissible items shall be set forth in the Inmate Guide.

8. Shall inform all incoming detainees of their rights under M.G.L. c. 276, § 58 (as amended 1971); shall inform them that bail review petitions are available upon request; and shall fulfill all the other requirements of M.G.L. c. 276, § 58.

9. Shall permit any inmate to have individual, private consultations with outside clergymen, including but not limited to Protestant, Catholic, Jewish and Muslim priests, ministers or rabbis. A clergyman may be required to produce credentials verifying his (or her) bona fides.

10. Shall make every effort to recruit and hire more Spanish-speaking personnel, so that staff members fully conversant in both Spanish and English are available to Spanish-speaking inmates during all shifts.