INMATES OF the SUFFOLK COUNTY
JAIL et al., Plaintiffs, Appellees,

v.

Thomas S. EISENSTADT et al.,
Defendants, Appellees,

Kevin H. White et al., Defendants,
Appellants.

No. 75–1116.

United States Court of Appeals,
First Circuit.

July 17, 1975.

Kevin F. Moloney, Asst. Corp. Counsel, Boston, Mass., with whom Kenneth Mickiewicz, Asst. Corp. Counsel, Boston, Mass., was on brief, for Kevin H. White and the nine Boston City Councillors, appellants.

Max D. Stern, Boston, Mass., with whom Burnham, Stern & Shapiro, Boston, Mass., Stanley A. Bass and Jack Greenberg, New York City, were on brief, for the Inmates of the Suffolk County Jail and others, appellees.

Before COFFIN, Chief Judge, McEN-
TEE and CAMPBELL, Circuit Judges.

**1242**

McENTEE, Circuit Judge.

On June 20, 1973, the Massachusetts District Court ruled that conditions at the Suffolk County Jail, also known as the Charles Street Jail, violated the prisoners' civil rights. *Inmates of Suffolk County Jail* v. *Eisenstadt,* 360 F.Supp. 676 (D.Mass.1973). As interim relief the court ordered that no cell contain more than one inmate awaiting trial. *Id.* at 691. To ensure compliance with its single cell occupancy order the court subsequently ordered certain prisoners transferred from the jail by the State Commissioner of Corrections, and we affirmed this order upon his appeal. *Inmates of Suffolk County Jail* v. *Eisenstadt,* 494 F.2d 1196 (1st Cir.), *cert. denied sub nom. Hall* v. *Inmates of Suffolk County Jail,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974). Late in 1974 the Committee on Criminal Justice ("CCJ"), a state agency responsible for apportioning federal Law Enforcement Assistance Act funds among various projects, decided to discontinue funding for the Bail Appeal Project at the jail. Because of this action the Mayor of Boston and the nine Boston City Councillors ("city defendants") decided to terminate the program rather than fund it with city funds. Alleging that the court's single cell occupancy order was in danger of frustration because the project removed the need to house an average of 20 to 30 defendants awaiting trial,[1] the plaintiffs, joined by Sheriff Eisenstadt and Jail Master Langlois ("county defendants"), moved for an order requiring the city defendants to continue the program. Appellees argued that elimination of the project would present the Hobson's choice of either violating the court order or randomly releasing inmates. After an informal hearing the court ordered the city defendants to continue the project. They appeal, claiming both that there was no clear and convincing showing that the ancillary order was necessary and that other feasible and less drastic alternatives existed. We affirm.

The appellants point to three characteristics of the instant order—it is (1) a mandatory injunction (2) directed to public officers of an instrumentality of a state (3) requiring them to perpetuate a social program—as providing ample reason for requiring the court to base its order on a "clear and convincing" showing of necessity. We agree that these factors are considerations that a court should weigh heavily in exercising its equitable powers, *see Lemon* v. *Kurtzman,* 411 U.S. 192, 208, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973), but we cannot agree that a court is powerless to act in the absence of a "clear and convincing showing" of necessity. The "clear and convincing evidence" standard governs various kinds of actions, *e. g.,* to prove a charge of fraud or undue influence or to demonstrate mutual mistake so as to reform an instrument. *See generally* 9 J. Wigmore, Evidence § 2498 (3d ed. 1940, Supp. 1972). But we know of no principle requiring such a showing as a precondition to exercising equitable powers in the circumstances presented here. The appellants' argument confuses two entirely different questions. The first is the standard the district court should apply in determining whether to grant injunctive relief. We fully agree with the principles of circumspection cited to us by appellants as appropriate limitations on the district court's powers. *See, e. g., Alabama Public Service Comm'n* v. *Southern Ry. Co.,* 341 U.S. 341, 349–50, 71 S.Ct. 762, 95 L.Ed. 1002 (1951); *Fox* v. *City of West Palm Beach,* 383 F.2d 189, 194 (5th Cir. 1967). The second and distinct question is the standard the appellate court should invoke in reviewing the district court's decision. That standard is whether the district court abused its discretion in concluding to grant the relief sought by plaintiffs and county defendants. *Deckert* v. *Independence Shares Corp.,* 311 U.S. 282, 290, 61 S.Ct. 229, 85 L.Ed. 189 (1940).

This question has two parts: did the court abuse its discretion in conclud-

---

1. Of 256 cells available in the jail, as few as three had been unoccupied at one point prior to the motion. Sixteen were unoccupied on the day of the first hearing in this matter.

ing that an ancillary order was needed to avoid frustration of its original order, and did it abuse its discretion in choosing the particular alternative it did rather than other proffered solutions. We consider these *seriatim*. Apparently there is no dispute that the jail was near capacity. Thus the crux of the matter is whether or not the imminent termination of the project could result in increasing jail occupancy by the alleged amount of 20 to 30 inmates. We observe that even though this proposition involved numbers, it was not easily susceptible of proof to a mathematical certainty. The plaintiffs' counsel offered the testimony of Jail Master Langlois to the effect that the project resulted in reducing cell demand by 20 to 30 persons, but the court accepted this representation without taking his testimony. Appellants now · argue that had he testified their questioning would have cast doubt on the method by which the conclusion was reached. But they made no such specific objection at the time and neither took steps to call Langlois as their own witness nor urged that he be called so they could cross-examine him. Courts are entitled, within reason, to use fair, informal procedures in conjunction with remedial matters of this nature, and absent more specific objection we find no abuse of discretion here.

We are also not impressed with the alleged fallacy itself. The argument claims that the figure of 20 to 30 inmates came from subtracting the present average daily population of the jail from the average daily population before the project's inception in 1972. This allegedly ignored the reductive effect of the court's intervening order to transfer all females from the jail (20 to 25 females were involved), and the effect of decriminalizing drunkenness, for which an average of 50 inmates had been in the jail. The fallacy is so obvious that only with difficulty could it have been overlooked by competent officials. But we do not have to rest on that act of blind faith. In its original opinion the district court found the average daily male population

since January 1, 1970, had been approximately 340 and the average female population had been 20 to 25. 360 F.Supp. at 681. These findings, entered in early 1973, would thus approximately indicate the average daily population before the project's inception in mid-1972. Even if the present average daily population of the jail is assumed to be 256, the maximum number of cells, subtracting 256 from the sum of 340 and 25 does not produce a number anywhere near 20 to 30. The difference of slightly more than 100 strongly suggests that appropriate account was taken of the effect of Judge Garrity's earlier orders on the inmate census.

One further item supported Judge Garrity's conclusion that the Bail Appeal Project was efficacious. At a hearing held after his oral order but before his written order the attorney for the county defendants stated that the project had filed some 1500 bail reduction petitions and had secured some 900 reductions. The appellants are certainly correct that there is no necessary one-to-one correspondence between bail reductions and inmate releases, but a reasonable inference is that many of these prisoners were able to await trial outside the jail. Depending on the average length of these waits, a figure which we cannot know with certainty, the beneficial effect on jail occupancy may have been significant. We cannot conclude that the district court abused its discretion in finding the program sufficiently efficacious to require its continuation absent some effective alternative. We also point out that the city defendants are county commissioners for Suffolk County, Mass.Gen.Laws c. 34, § 4, and thus in their official capacities they are partly responsible for furnishing a suitable jail. *Id.* § 3. *See also id.* § 14; c. 126, §§ 1, 29. Thus the district court could appropriately require the city defendants to assist in meeting the current crisis. *See Inmates of Suffolk County Jail v. Eisenstadt,* 494 F.2d 1196.

Thus we turn to the alternatives offered. The appellants concede that it

was an unreasonable alternative simply to release all prisoners in excess of the jail's capacity. The court expressly rejected that course as antithetical interference with state judges. The alternatives offered by the appellants are these: (1) joining the CCJ as a defendant and ordering it to continue funding, (2) ordering transfer of some 20 federal prisoners from the jail to other institutions, and (3) using the Comprehensive Employment and Training Act (CETA) to provide money to conduct a bail project. Before considering these specific alternatives, we note that the expense connected with the court's order, some $48,000, is small in comparison with the suit's total cost and with the city's budget. Where the differential cost between various alternatives is trivial, as it is here, it would be rare, if ever, that a court would abuse its discretion by adopting a more expensive approach if any other factors favored the court's action.

The district court rejected the first alternative because it would logically necessitate allowing the intervention of those who suffered reduced grants as a result of the diversion of CCJ funds. The appellants do not attack that reasoning, but they claim its premise was wrong, because the CCJ had a surplus which the court could reach. The transcript passage relied on for this assertion is less than pellucid in support, and a statement to the court by a member of the CCJ, one Murray, disclosed that two and one-half dollars were requested from CCJ for every dollar it had available for disbursement. This is hardly a surplus budgetary picture.[2]

Housing federal prisoners at the jail is authorized by 18 U.S.C. § 4002 (1970), which allows the Director of the Bureau of Prisons to contract with proper state or local authorities for such quarters for periods of three years or less. Appellants have not given us any indication of the terms of their contract with the federal authorities, but it would appear that either the contract was terminable at will or not. In the former case, the city defendants are free to terminate the contract, now that they know what costs are involved with the court's alternative, and then seek modification or vacation of the order in the district court. If it was not terminable at will, we cannot say that the district court abused its discretion in not aiding the city to breach its contract with the federal authorities.

The third alternative, replacing project lawyers and staff with CETA lawyers and staff, was rejected by the district court on the ground that maintenance of the ongoing program was preferable to replacing that program with new, inexperienced personnel. That continuation of the program was only to be required for a period somewhat over a year strengthens the force of this argument. The short-term start-up costs of having relatively inexperienced personnel take over a program are more significant when the life of the replacement is relatively short. Since the court's order required continuation of the project only until June 1976, it was not an abuse of discretion to refuse to modify the earlier order to allow a new program funded by CETA to be set up in lieu of the established project.

*Affirmed.*

---

**2.** Rejection of this alternative might also have been based on the theory that the CCJ had "a right not to be forced to participate in a rescue operation." *See Inmates of Suffolk County Jail* v. *Eisenstadt,* 494 F.2d at 1199.