**M. C. I. CONCORD ADVISORY BOARD et al., Plaintiffs,**

v.

**Frank A. HALL et al., Defendants.**

**Civ. A. No. 75–1463–C.**

United States District Court,
D. Massachusetts.

March 21, 1978.

Barbara A. Shapiro, Burnham, Stern & Shapiro, Boston, Mass., Jack Greenberg, Stanley A. Bass, New York City, for plaintiffs.

Lee Carl Bromberg, Sp. Asst. Atty. Gen., Dept. of Correction, Boston, Mass., Andra R. Hotchkiss, Sp. Asst. Atty. Gen., Massachusetts Dept. of Public Health, Boston, Mass., for defendants.

### OPINION

CAFFREY, Chief Judge.

This is a civil rights action brought under 42 U.S.C.A. § 1983. Plaintiffs challenge conditions of confinement at the Massachusetts Correctional Institution in Concord (M.C.I. Concord). Jurisdiction is claimed under 28 U.S.C.A. § 1343(3) and (4). Plaintiffs in this action include the M.C.I. Concord Advisory Board (Board), purporting to act on behalf of all inmates at M.C.I. Concord; various individual Board members, including some inmates and some community representatives. Other inmates who do not serve on the Board are also named as plaintiffs. Defendants are Frank Hall (Hall), Massachusetts Commissioner of Correction, and Edward Douzanis (Douzanis), superintendent of M.C.I. Concord who has been substituted for Nicolas Genakos, former superintendent of the institution.

Plaintiffs allege their constitutional rights are being violated by persistent overcrowding at M.C.I. Concord. They also contend constitutional violations exist in other aspects of their living conditions, specifically in medical care, in sanitation, in rehabilitation, and in inadequate provision for their physical safety. They argue that conditions of confinement at the institution constitute cruel and unusual punishment in violation of the Eighth Amendment, and also allege violations of the Equal Protection and Due Process clauses of the Fourteenth Amendment. Broad injunctive and declaratory relief is sought. While defendants concede that overcrowding exists and that conditions at M.C.I. Concord are far from ideal, they assert that constitutional standards are met.

Plaintiffs filed the complaint in this action in April, 1975. After extensive discovery, the case went to trial on May 17, 1976. On that day, a partial consent decree was filed under which the Commissioner of Public Health—originally named as a defendant—agreed to issue new prison regulations. The consent decree did not include either defendant Hall or defendant Douzanis. After one day, the trial was suspended, and the remaining parties engaged in protracted efforts at settlement. After settlement efforts collapsed, the trial resumed in late April, 1977, and lasted five days.

On the basis of the evidence adduced at trial plus observations made during a view of several-hours duration at M.C.I. Concord on May 3, 1977, I find the following facts:

M.C.I. Concord houses male felons, the majority of whom range in age from seventeen to twenty-five. Physical facilities at the institution include the so-called farm area—a minimum security area outside the walls; the so-called E Building which as the largest building houses the vast majority of inmates; the New Line, the hospital area and certain special purpose cells. The parties have stipulated that there is no issue before the Court as to conditions in E Building or as to the farm area and that the present controversy extends only to the New Line, the hospital ward, and the special purpose areas.

The New Line area houses inmates upon their arrival at the institution during processing through the Northeastern Reception Diagnostic Center (NRDC). NRDC's purpose is to classify, evaluate and place inmates. The New Line area consists of a two-tiered cell block with a total of fifty cells, twenty-five on each tier. The cells on each tier line the outside walls of the building. Each cell is about six feet wide by eleven feet long. The two eleven-foot walls are solid, while the other two consist of an outside wall with a window approximately four-foot square opposite which is an open grillwork wall containing the grilled entrance door to the cell. The New Line area is divided by a screen which runs the length

of the center of each tier, blocking the view of cells on one side from those on the other.

Each cell contains a toilet and sink with hot and cold water, a double bunkbed with mattresses, a chair, two metal shelves situated so as to serve as a table and a third shelf with hangers attached for clothing. Each cell has a light bulb and an electric outlet. There is only one shower on each tier, but additional shower facilities are available in the New Line basement.

Inmates housed in the New Line are generally placed two to a cell. While in their cells, inmates are supplied with books and correspondence materials, and they may use their own radios, televisions and/or stereos except late at night. Generally, they are permitted to be outside their cells about six hours each day. At about 8:00 a.m., 12:30 p.m. and 5:30 p.m., New Line inmates go to the main dining room located in another building for a communal meal lasting about one-half hour. Each day two recreation periods of two hours' duration are scheduled. Recreation facilities include a day room with tables and chairs, an outdoor exercise yard with basketball court and volleyball net, and a basement recreation area equipped with two pool tables and three ping pong tables. In inclement weather the institution gym is available for use.

Seven of the approximately 100 New Line inmates have paid jobs within the institution. Five act as janitor helpers and in that capacity maintain the common areas of the New Line. Individual cells are cleaned by the occupants with equipment and supplies provided by the institution and meet reasonable standards of cleanliness and sanitation.

The medical examination, social worker interviews, counselling sessions and classification meetings that form the nucleus of the New Line's classification program increase out-of-cell time. Moreover, each inmate may have three regular visits per week with family and friends, two of two hours' duration and one of one hour. Attorney visits are unlimited.

While plaintiffs complain about general living conditions on the New Line, the gravamen of their complaint is the doublecelling. This aspect of New Line operation varies from desirable correctional practices, as defendants concede. Doublecelling occurs throughout the classification and placement process, which generally lasts eight to twelve weeks and sometimes longer.

Doublecelling at M.C.I. Concord also occurs in certain of the special purpose housing areas. These areas, located in the same building as the New Line, include protective custody, awaiting action, observation, isolation and holding cells.

The protective custody area consists of twelve cells, each originally designed for a single inmate. Cells in this area are physically similar to New Line cells in size and furnishings. These cells are reduced to dark holes by reason of the fact that not only are they windowless, but also they have an almost solid fourth side in lieu of the open grillwork doorwall contained in the New Line area. The very small door opening in these cells permits entry of a minimum amount of light and air from the common passageway. It should also be noted that there is no recreational or vocational area available for the use of those inmates housed in protective custody cells.

These cells can fairly be characterized as unglorified cages and are substandard areas for the confinement of even a single prisoner, much less for the confinement of two inmates simultaneously. At the time of trial there were forty-seven inmates in protective custody at M.C.I. Concord. The fact that these inmates for the most part requested placement in protective custody does not change the status of their conditions of incarceration. It is obvious that those who request protective custody must exercise the classic Hobson's choice. They opt between the lesser of two evils, and in no way can those inmates requesting protective custody status be characterized as having exercised voluntary relinquishment of a known right to be free from incarceration under conditions which are intolerable and a clear violation of Eighth Amendment standards.

In addition to the twenty-four inmates kept in the twelve designated protective custody cells, inmates requesting protective custody status are housed in several other areas at issue herein. There are twelve "awaiting action" cells which are physically similar to those in the protective custody unit. They were originally intended for inmates awaiting determination of serious disciplinary charges.

M.C.I. Concord inmates are also routinely housed two to a cell in the six institutional holding cells. These cells were designed for containing for a few hours, or possibly overnight, those inmates in transit to or from the prison. Now, because of overcrowding, holding cells are generally utilized to house the protective custody overflow. All holding cells lack regular plumbing and furnishings. Two of the six holding cells are located below ground, and all six cells are windowless.

In addition to protective custody, awaiting action and holding cells, the special purpose area also includes two observation cells, designed for men needing constant attention for mental disorders or possible suicide attempts. These cells lack windows, regular furnishings and plumbing. A hole in the floor serves as a toilet. The special purpose area also includes isolation cells, used for men guilty of disciplinary infractions. These cells are smaller than New Line cells and are windowless. No evidence was presented indicating doublecelling in either the observation or isolation area, and I make no finding of illegality as to them.

The third challenge in this case goes to the use of the hospital ward room as a dormitory. This area serves as housing for inmates awaiting transfer to E Building. The ward room measures seventeen by forty-seven feet and houses approximately thirty inmates. The room contains ten triple bunkbeds, two tables, benches and chairs. It has two four-foot high partitions which divide the room roughly into thirds. In two of those areas bunks are located. The third area contains toilet facilities which include two toilets in stalls, one urinal, two sinks and one shower. Hot and cold running water is available. There are six windows in the room, each approximately four by five and one-half feet. There is also an observation window measuring twenty feet by four feet on the corridor side of the room.

An inmate's stay in the ward room is brief, averaging approximately two weeks. While housed in the ward room, inmates participate in the general population programs. Since they are eligible to do anything an inmate in E Building can do, they are in the ward room only for sleeping purposes, between the hours of 10:00 p.m. and 7:00 a.m. I rule that plaintiffs have not sustained their burden of establishing that this kind of dormitory use of the hospital ward room violates the constitutional rights of the inmates who sleep therein.

Another aspect of plaintiffs' attack on the use of the ward room as a dormitory is that this operates to deprive other inmates of necessary medical attention. I find that wherever M.C.I. Concord inmates are housed, they are provided a range of medical services. The institution employs a full-time physician who holds sick call for two to three hours six mornings a week and who provides on-call coverage himself or by means of another physician twenty-four hours a day, seven days a week. The Director of Health Services for the Department of Correction provides back-up supervision and coverage. In addition to the general physician, the institution employs a physician assistant, four medics, and part-time dentists and psychiatrists.

The medical services facility consists of an infirmary, a treatment and examining room, a doctor's office, a dentist's office, an administrative office, a utility and laboratory office and a hospital cell. An inmate who wishes treatment may either put in a sick slip in the evening or report for sick call in the morning. There he is screened by the physician or the physician assistant. If he needs nonemergency treatment by a specialist, he is seen at the M.C.I. Norfolk Hospital or the Shattuck Hospital, or elsewhere. In the case of minor medical emergencies, an inmate is treated in the infirma-

ry. In a life-threatening emergency, the institution physician moves the inmate to Emerson Hospital, near the prison.

Because the hospital ward room is used for non-medical purposes, an inmate who is not seriously ill is sent back to his cell to recuperate. An inmate more seriously ill or determined to be contagious is either transferred to the hospital at M.C.I. Norfolk or housed in a small isolation room in the M.C.I. Concord infirmary. At M.C.I. Concord, physical examinations are performed on all new inmates. Medical records are kept on all inmates, and each has a separate medical file. When necessary, special medical diets are prepared under a dietician's supervision. On the basis of the foregoing, I rule that plaintiffs have failed to show that the use of the ward room has infringed on the constitutional rights of M.C.I. Concord inmates to adequate medical care.

I also find that the same disciplinary procedures are applied to all inmates at M.C.I. Concord, whether they are housed in the New Line, the hospital ward room, or elsewhere. These procédures follow uniform Department of Correction regulations, and plaintiff's own witness concedes that they are fair. Such procedures include advance written notice of charges, a hearing before an impartial, three-member board, the right to representation by an attorney or law student, the right to question the reporting officer, the right to call witnesses, a written decision, the right to appeal decisions or sanctions to defendant Douzanis, and the right to appeal any decision involving loss of good time to defendant Hall.

Plaintiffs have raised factual questions regarding distinctions between M.C.I. Concord and other state prisons. Inmates committed to Concord tend to be young, first-time offenders with relatively short sentences. Eighty-one percent are experiencing their first commitment to a correctional institution. Relatively speaking, Concord inmates have lesser indicia of serious behavior problems and assaultive propensities than inmates of other state penal institutions. Accordingly, less risk of harm exists in doublecelling inmates of M.C.I. Concord than in doublecelling older inmates with more serious behavior problems.

In deciding the constitutional issues raised by plaintiffs, this Court desires to avoid unnecessary intervention in the internal administration of a state penal institution. I am particularly mindful of the observation of the Court of Appeals for the Second Circuit:

It is not only that we, trained as judges, lack expertise in prison administration. Even a lifetime of study in prison administration and several advanced degrees in the field would not qualify us as a federal court to command state officials to shun a policy that they have decided is suitable because to us the choice may seem unsound or personally repugnant.

Sostre v. McGinnis, 442 F.2d 178, 191 (2d Cir. 1971). [Emphasis in original]

The Supreme Court has consistently emphasized the doctrine of federal deference to decisions of state prison administrators except in situations where federal constitutional violations are clearly evident. See, e. g., Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 125–126, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); Procunier v. Martinez, 416 U.S. 396, 405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

There are several subsidiary issues to be resolved herein, including the question of plaintiffs' standing to bring this action. It is well-recognized that this Court's jurisdiction cannot be invoked unless a plaintiff himself has suffered "some threatened or actual injury resulting from the putatively illegal action." Linda R. S. v. Richard D., 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). Here the named community members of the Board and the Board itself seek to raise the rights of third parties. Generally, a plaintiff cannot rest his claim on the legal rights of third parties. Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The Board has alleged no injury to itself qua organization. Insofar as the Board asserts standing on the basis of its special interest in inmate conditions, its claim fails because it could establish standing only as a representative

of those members who could bring suit in their own right. *Id.* An organization's "abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by article III." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976).

Furthermore, the Board's community representatives lack standing because the Record is devoid of any allegation of injury to themselves. That this suit was originally brought as a class action does not confer standing on either the Board or its community members. Named plaintiffs who seek to represent the class must "allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong or which they purport to represent." *Warth v. Seldin, supra* 422 U.S. at 502, 95 S.Ct. at 2207. Thus it follows, and I rule that the only plaintiffs with standing in this matter are the various named M.C.I. Concord inmates.

■ The record does not indicate whether these inmates are presently incarcerated. Even if they are not, I rule the case is not thereby rendered moot because the questions involved here are those capable of repetition, yet evading review. *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); *Dillard v. Pitchess,* 399 F.Supp. 1225 (C.D.Cal.1975).

■ The major constitutional issue raised by this case is whether the inmate overcrowding in certain areas at M.C.I. Concord constitutes cruel and unusual punishment in violation of the Eighth Amendment, made applicable to the states by the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). The Eighth Amendment proscription against cruel and unusual punishment is flexible, "draw[ing] its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598,

2 L.Ed.2d 630 (1958) (plurality opinion). Penal measures are to be evaluated against "broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), quoting with approval *Jackson v. Bishop,* 404 F.2d 571, 579 (8th Cir. 1968).

■ In examining M.C.I. Concord, I have applied this traditional Eighth Amendment test, *i. e.,* whether conditions of confinement within the institution violate contemporary standards of decency. Living conditions acceptable fifty years ago ". . . may, with the passage of time, cease to meet the community's standards of humane treatment, particularly as people learn more about the goals and problems of penology." *Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676, 688 (D.Mass. 1973), *aff'd* 494 F.2d 1196 (1st Cir. 1974), *cert. denied sub nom. Hall v. Inmates of Suffolk County Jail,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974), ancillary relief *aff'd,* 518 F.2d 1241 (1st Cir. 1975). I find on all the evidence before me a mode of imprisonment within certain sections of the special purpose unit—namely, the protective custody, "awaiting action" and holding cells—sufficiently shocking as to violate standards of common decency. The basis of my ruling of unconstitutionality is the *totality* of the living conditions in these areas—the doublecelling in certain rooms designed for single occupancy, the lack of adequate fresh air, plumbing, lighting and ventilation, and the dearth of vocational and recreational facilities.

Plaintiffs contend that doublecelling in rooms designed for single occupancy is *per se* unconstitutional. However, various other federal courts have found to the contrary. *See, e. g., Newman v. Alabama,* 559 F.2d 283 (5th Cir. 1977). The record before this Court does not establish that the Eighth Amendment prohibition against cruel and unusual punishment includes all doublecelling at M.C.I. Concord. Rather,

[t]he question of whether a prison is overcrowded to the point of unconstitutionali-

ty involves more than determining how many square feet of living space are allocated to individual inmates. Regard must be had to the quality of the living quarters and to the length of time which inmates must spend in their living quarters each day.

*Finney v. Hutto*, 410 F.Supp. 251 (E.D. Ark.), *aff'd.*, 548 F.2d 740 (8th Cir. 1976), *cert. granted*, 434 U.S. 901, 98 S.Ct. 295, 54 L.Ed.2d 187 (1977). Given the fact that the inmate's stay within the New Line area is only temporary and that prisoners may remain outside their cells approximately six hours a day, I rule that conditions within that unit, while far from ideal, do not constitute an Eighth Amendment violation. *Cf. Newman v. Alabama, supra.*

■ Plaintiffs further urge the Court to rule that dormitory conditions of the kind in existence within the hospital ward room constitute cruel and unusual punishment. This proposal has been rejected by other courts. *See, e. g., United States ex rel. Wolfish v. Levi*, 439 F.Supp. 114 (S.D.N.Y. 1977), in which Judge Frankel commented:

> There is tension, to be sure, in shared sleeping quarters . . . [b]ut the problems seem manageable enough to leave the choice within the judgment of [prison authorities] . . . Perhaps we shall evolve to [a] higher minimum . . . At the moment, we are too close to wars and barracks . . . to hold that dormitories are *per se* forbidden.

*Id.* at 137, n. 23. Moreover, the Court of Appeals for the Fifth Circuit has stated that:

> [t]he functions and characteristics of each building should be taken into account in arriving at the capacity of each. A simple mathematical calculation of total square feet of space divided by a standard of square feet per man may not necessarily be appropriate or practicable.

*Williams v. Edwards*, 547 F.2d 1206, 1215 (5th Cir. 1977). Accordingly, I rule that dormitory conditions at the hospital ward room, while again less than ideal, are not unconstitutional, particularly since the in-

mate's stay therein is brief and only for sleeping purposes.

Plaintiffs also contend, albeit peripherally, that their rights under the Equal Protection Clause have been contravened. The crux of their argument appears to be that inmates undergoing classification and placement at other state institutions are single-celled in contrast to the doublecelling during classification at M.C.I. Concord.

■ In analyzing this Equal Protection challenge, the Court must first identify the interest the state seeks to advance in justifying its procedures within the New Line and then consider whether the challenged classification is rationally related to a legitimate state interest. *See, e. g., New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *City of Charlotte v. Local 660, Intl. Assoc. of Firefighters*, 426 U.S. 283, 96 S.Ct. 2036, 48 L.Ed.2d 636 (1976). Since this case involves neither a suspect classification nor a fundamental interest, a heavy burden rests with the plaintiffs to demonstrate that no rational justification exists for the separate classification programs. It has been frequently stated that "[t]he constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the state's objective." *McGowan v. Maryland*, 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).

The legitimate state interest asserted here is the operation of a secure correctional system. The state argues that a rational means to accomplish this objective is by separating the generally younger inmates at M.C.I. Concord from older criminals in other institutions in order to protect the younger men and further their chances for rehabilitation. This recognized principle of correctional administration was acknowledged by plaintiff's witness, the NRDC Director, Barbara Young. Defendants advance a second justification for separation of Concord placement from that of other state penal institutions. Concord inmates, relatively speaking, exhibit fewer behavior problems and assaultive tendencies because of their age and prior history than do inmates elsewhere in the State.

**406**

The legitimacy of these state objectives has been recognized by the Supreme Court: "[c]entral to all other correctional goals is the institutional consideration of internal security." *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Nothing in the Constitution requires prison officials to treat all inmate groups alike where differentiation may avoid institutional disruption or violence. *Jones v. North Carolina Prisoners' Labor Union, Inc., supra.* I rule that since plaintiffs have not demonstrated that defendants' actions bear no rational relation to the state's legitimate interest in maintaining safety and order within its prison system, their Equal Protection claim fails.

Plaintiffs also allege Due Process violations, on the grounds that living conditions within the three areas of the institution under challenge are more punitive than conditions in other units of M.C.I. Concord. This argument was neither briefed nor developed at trial. Of course, the actions of prison officials in separating newly-admitted inmates and protective custody prisoners from the general prison population are subject to the basic Due Process requirement that such distinctions be rational rather than arbitrary or capricious. *Nadeau v. Helgemoe*, 561 F.2d 411 (1st Cir. 1977); *O'Brien v. Moriarty*, 489 F.2d 941, 944 (1st Cir. 1974). However, on the Record before me, I find no evidence whatsoever that the method of classifying inmates within M.C.I. Concord is capricious or arbitrary.

In summary, I rule that plaintiffs have sustained their burden of proving that incarceration of inmates in the protective custody cells, in the awaiting action cells, and in the institutional holding cells violates Eighth Amendment standards and, consequently, should be permanently enjoined. Plaintiffs have not sustained their burden of proving that doublecelling in the New Line area and the use of the hospital ward room for a dormitory violate Eighth Amendment standards. Consequently, the continued use of these two areas for those purposes will not be enjoined.

Counsel are directed to confer and submit to the Court not later than 20 days from the date hereof a form of a proposed order embodying the above rulings.