**Albert BLAKE, et al., Plaintiffs,**

v.

**Michael FAIR, et al., Defendants.**

**Civ. A. No. 78–3051–Mc.**

United States District Court,
D. Massachusetts.

June 2, 1983.

Judith Stalus, Michael Avery, Norman Zalkind, Boston, Mass., for plaintiffs.

Lee Carl Bromberg, Alexander G. Gray, Jr., Asst. Atty. Gen., Boston, Mass., for defendant.

MEMORANDUM AND ORDER

McNAUGHT, District Judge.

This matter came on to be heard on plaintiffs' motion for appropriate relief pursuant to the order issued December 18, 1981 by the Court of Appeals for the First Circuit. Plaintiffs request that this court declare the New Man's Section at M.C.I. Walpole subjects inmates to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution. They seek to enjoin further use of this section for housing inmates. I find, after a full evidentiary hearing, that the physical conditions in the New Man's Section are unconstitutional and permanently enjoin defendants from continuing to house inmates therein. I would have made this finding and issued the order in September of 1980 had it not been represented to me by defendants that they intended to close the section.

There have been no physical changes in the New Man's Section, which the Court of Appeals termed "a dungeon", since August of 1979. There is no ventilation and no natural light. It is below ground level. The cell areas are on the four outside walls. The cells on the right hand side have solid doors with a small window cut in the door. There is one light which hangs from the ceiling that was estimated to be a 60-watt bulb. There are still problems with seeping water and sewage. The deplorable conditions have worsened, due to the overcrowding within the institution. When an inmate arrives, an intake form must be completed and he must have an identification photograph taken before he will be placed into general population. If an inmate arrives on a Friday, he would be unlikely to receive the proper documentation until Monday. (Monday would be the earliest possible date for an inmate brought in on a Friday.) The defendants have attempted to minimize the period of time inmates remain in the New Man's Section; seventy-five percent of those placed in the section remain seven days or less and ninety-five percent remain

two weeks or less (Exhibit Q). The New Man's Section is presently being used to accommodate 26 inmates. There are eight cell areas in which inmates have been double-celled since November of 1980, and on occasion inmates in those cells have been triple-celled with the third inmate being placed on a mattress on the floor. In the middle of the New Man's Section is a cage area in which ten men are housed in five double bunks. The cage area, formerly a halting area, is enclosed by a floor to ceiling chain link fence which has one door. This area has no facilities such as a toilet or sink. There was a chemical toilet in the cage some of the time, but it was moved out because of the odor.

Defendants have instituted a new policy, whereby some of the inmates in the section are allowed to be in general population ("day room program"). The policy does not apply to all inmates. Two inmates testified before the court, Kenneth Dascoli and Harry Ambers. Dascoli testified that he was not permitted to leave the cage area between January 4, 1983 and February 5, 1983 when he was assigned to the cage area within the New Man's Section. Since Dascoli was a protective custody inmate, he was not eligible to participate in the day room program. He testified that there are always guards on duty in the New Man's Section from 7:00 A.M. until 3:00 P.M.; sometimes there are no guards on from 3:00 P.M. until 11:00 P.M.; and from 11:00 P.M. until 7:00 A.M. there is a guard at the desk (he watches a monitor). During the late shift, an inmate in the cage area will not be allowed to use the toilets until four or five guards finish their night count and then go down to the New Man's Section to accompany those desirous of using the facilities. Mr. Ambers testified that he was a "runner", a participant in the day room program, and that he used the law library five evenings a week from 6:30 until 8:00. All of the inmates housed in that area return to it together in the evening.

Joseph Ponte, the Superintendent at M.C.I. Walpole for the past three years, testified that in 1980 the population at Walpole was at 650 and it is now well over 720

(average daily counts for this year have been in the vicinity of 725 to 730). The facility was built to house 666 inmates. The use of day rooms was an administrative idea aimed at alleviating the overcrowding; however, since it is a policy promulgated by the Superintendent, it may be changed by him at any time. The Superintendent has the ability to change the policy, start a new one, or end it. There are certain inmates who are ineligible for the program: those in protective custody or with a protective custody problem, inmates awaiting status, inmates in isolation, and inmates classified to segregation. Mr. Ponte testified that if overcrowding did not exist, inmates put into the New Man's Section would only be there one or two days before being moved into population. The institution has attempted to limit the length of time an inmate spends in the New Man's Section. Superintendent Ponte said that he tries to have inmates moved into HSU (Health Services Unit) as soon as a bed becomes available because there is "natural light and better ventilation". Ronald Duval, a Correction and Assignment Officer at M.C.I. Walpole, communicated a similar sentiment. He testified that he considered the following factors in placing inmates: the crime, the age of the inmate, the known enemies of the inmate and the room availability. He said that his first choice was to place an inmate in HSU, then if he had to, he would place one in a cell in the New Man's Section, and as a last resort he would place the inmate in the cage area within the New Man's Section.

Superintendent Ponte emphasized that he has no control over the number of inmates he is compelled to house. Walpole is a committing institution and he exercises no power over intake or output. Walpole receives those sentenced by courts, parole violators returned, and inmates returned to higher custody. The utilization of the New Man's Section and HSU, according to Superintendent Ponte, helps keep the effects of overcrowding in a confined area. If the institution were to be denied the use of that area, he said, the effects of overcrowding

would ripple over to other cell blocks and affect the overall operation of the maximum security prison. Shortly before this hearing took place, Superintendent Ponte was told by the Superintendent at Concord that 65 inmates had to be moved in order to acquire three beds. Ponte said, and I quote, "... The system has a problem, it is not only Walpole's problem. My position as Superintendent leaves me with no ability to control the problem. Not only can I not control input, I have no control on output ... parole." The problems which prevail at Walpole and other state institutions require attention; however, the sole issue is whether or not there has been a constitutional violation.

■ There are two traditional tests to be considered in determining whether or not there has been a violation of the Eighth Amendment amounting to "cruel and unusual punishment": (1) whether the punishment is so barbarous that it offends society's evolving sense of decency, and (2) whether the punishment is grossly disproportionate to the offense. *Nadeau v. Helgemoe*, 561 F.2d 411, 413 (1st Cir.1977). The focus of this court has been directed toward whether the conditions in Walpole's New Man's Section offend society's evolving sense of decency. In *Hawkins v. Hall*, 644 F.2d 914 (1981), the Court of Appeals for the First Circuit held that:

> ... the conditions of confinement within an institution cannot "violate contemporary standards of decency." *M.C.I. Concord Advisory Board v. Hall*, 447 F.Supp. 398, 404 (D.Mass.1978); ... Thus, unconstitutional conditions may exist where, for example, there is a "double-celling in certain rooms designed for single occupancy, the lack of adequate fresh air, plumbing, lighting and ventilation, and the dearth of vocational and recreational facilities." *M.C.I. Concord Advisory Board v. Hall*, 447 F.Supp. at 404. "An isolation cell must be sanitary, adequately lighted and ventilated." *Laaman v. Helgemoe*, 437 F.Supp. 269, 310 (D.N. H.1977).

It is clear that the present conditions in the New Man's Section at M.C.I. Walpole constitute "cruel and unusual punishment," and that the area cannot be made fit for human habitation.

Although inmates may not be subjected to the conditions within the New Man's Section 24 hours a day, to have to endure those conditions for even a portion of one's day offends societal standards. Doublecelling and triplecelling, by themselves, may not give rise to a constitutional violation, but those conditions, coupled with the location of the New Man's Section, its poor ventilation, and the lack of proper plumbing facilities, all contribute to the unconstitutional conditions in the New Man's Section.

For the foregoing reasons, further use of the New Man's Section at M.C.I. Walpole for housing inmates is enjoined permanently.